IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2017

**STATE OF TENNESSEE v. JOSHUA TEFFETELLER**

**Appeal from the Circuit Court for Blount County**
**No. C-21131, C-24062, C-24064-65     David Reed Duggan, Judge**

_____

**No. E2017-00101-CCA-R3-CD**

_____

In February 2013, the Defendant, Joshua Teffeteller, pleaded guilty to identity theft, and the trial court granted judicial diversion and ordered him to serve three years on Community Corrections.  On September 17, 2015, the Defendant was charged with numerous offenses and, the following day, the Defendant's Community Corrections officer filed an affidavit, alleging that the Defendant had violated his Community Corrections sentence on multiple grounds.  The Defendant pleaded guilty to the charges on March 7, 2016, and received additional Community Corrections sentences.  On August 25, 2016, another probation violation warrant was issued and, after a hearing, the trial court revoked the Defendant's Community Corrections sentences and ordered the Defendant to serve the balance of his sentences in confinement.  On appeal, the Defendant contends: (1) that the trial court erred when it ordered him to serve his sentences in confinement rather than reinstating his Community Corrections sentences; and (2) that one of his sentences had expired.  After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Mark Stephens, District Public Defender, and Michael R. Tabler, Assistant District Public Defender, Knoxville, Tennessee, for the appellant, Joshua Grant Teffeteller.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Mike L. Flynn, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## I. Facts

On February 11, 2013, the Defendant pleaded guilty to identity theft ("C21131"), a Class D felony. The trial court granted judicial diversion and ordered the Defendant to serve three years on Community Corrections. On October 10, 2014, the Defendant pleaded guilty to theft and the trial court imposed a sentence of eleven months and twenty-nine days to be served consecutively to C21131. On July 24, 2015, the Defendant pleaded guilty to theft, receiving a sentence for eleven months and twenty-nine days to be served consecutively to the October 10, 2014 theft conviction. On September 17, 2015, the Defendant was arrested for two counts of theft of property over $500, one count of theft of property under $500, one count of theft of property over $1000, three counts of burglary of a building, and three counts of burglary of a vehicle. The Defendant pleaded guilty to these offenses on March 7, 2015.

Following these charges, the trial court issued a probation violation warrant based upon the new arrests, the Defendant's failure to report to his probation officer, failure to provide proof of employment, testing positive for Benzodiazepine, failure to pay court costs and supervisions fees, and failure to show proof of completion of 100 hours of community service. On March 7, 2016, the Defendant waived his right to a hearing and stipulated to the facts set out in the violation of Community Corrections warrant. By agreement of the parties, the trial court found that the Defendant had materially violated the conditions of his sentence and ordered the Defendant to serve 267 days in jail with the balance to be served through Community Corrections. The trial court also required that the Defendant complete Recovery Court.

On April 13, 2016, the trial court issued a probation violation warrant based upon the Defendant's discharge from Recovery Court. The Defendant once again waived his right to a hearing and stipulated to the facts as set out in the violation of Community Corrections warrant. By agreement of the parties, the trial court found a material violation and ordered the Defendant to serve 160 days before returning to Community Corrections for the balance of the sentence. On August 25, 2016, the trial court issued a third probation violation warrant based upon the Defendant testing positive for Benzodiazepine. The affidavit was later amended to add that the Defendant had tampered with a drug screen and then tested positive for numerous substances following his arrest on the probation violation.

On December 20, 2016, the trial court held a hearing and the parties presented the following evidence: Richard Stonis, the Defendant's Community Corrections officer, testified that he met with the Defendant on August 17, 2016, for an intake upon the

Defendant's release from jail. The Defendant had already been in Community Corrections so the majority of paperwork had already been completed, but Mr. Stonis arranged for the Defendant to be assigned to "an MRT group" and set up days for "check-in." Additionally Mr. Stonis reviewed the rules and conditions of Community Corrections with the Defendant.

Mr. Stonis testified that several days later, the Defendant contacted him by phone. The Defendant notified Mr. Stonis that he had been to a doctor and obtained a prescription. He inquired about whether he could take the prescription and still comply with the conditions of his sentence. Mr. Stonis advised that the Defendant could begin taking the prescribed medication but that he needed to bring the medical documentation, the prescription, and the pill bottles to his next group meeting on August 23, 2016. Mr. Stonis was not present at the group meeting but later learned that the Defendant failed to bring the necessary items as requested. The following day, Mr. Stonis contacted the Defendant and directed him to bring the medical documentation, the prescription, and the pill bottles that day. When the Defendant arrived, Mr. Stonis advised the Defendant he would be required to undergo a urine screen. The screen indicated the presence of Benzodiazepine.

Mr. Stonis testified that on August 24, 2016, he discussed with the Defendant his conduct at the group meeting the previous night and the failed drug test. Mr. Stonis asked the Defendant for the requested medical documentation for the prescribed medication. The Defendant produced three receipts from a pharmacy for three separate prescriptions. Mr. Stonis identified the results of the urine screen and the pharmacy receipts. The receipts indicated that the prescriptions were filled on December 9, 2015, and that there were "no refills." Mr. Stonis explained to the Defendant that the receipts showed "old prescriptions" and asked about whether the Defendant had current prescriptions. The Defendant stated that he did not but that he had a scheduled doctor's appointment on September 15, 2016, approximately three weeks later.

Mr. Stonis testified that he advised the Defendant that he was going to file a warrant based upon the failed drug test and the old prescriptions. Further, he told the Defendant that he would contact him after he had filed the warrant and that the Defendant would "need to surrender." Mr. Stonis filed the warrant on August 25, 2016, and then called the Defendant to notify him of the active warrant and told him "he needed to surrender." The Defendant stated that he would do so but, ultimately, did not.

Mr. Stonis identified inmate drug testing forms for Blount County Jail. The forms were dated October 6, 2016. The first form evidenced an attempt to conduct a screen at 9:00 a.m., however, the Defendant "was caught filling the urine cup with water." This form was signed by the Defendant. The second form evidenced a screen conducted at

10:43 a.m., and indicated that he tested positive for "BZO's, methamphetamine, amphetamine, and oxycodone." This form was also signed by the Defendant. Mr. Stonis testified that he supervised the Defendant for "[b]asically a week." He stated that he did not believe that he could effectively supervise the Defendant.

On cross-examination, Mr. Stonis agreed that the Defendant complied with his request to come to the office on August 24, 2016. He further agreed that the Defendant attended the scheduled MRT class; however, he noted that the Defendant appeared at the August 23, 2016 MRT class "intoxicated and had to be escorted out."

Sheila Pellasma, a Community Corrections treatment specialist, testified about the August 23, 2016 MRT class that the Defendant had attended. She said that when he entered the room, "he appeared very drowsy, his speech was slurred, he had a staggered gait, and he had difficulty following what [they] were trying to do in the MRT group." Ms. Pellasma recalled that the other group members "appeared to be very uncomfortable," so she removed the Defendant from the group and spoke with him in her office. The Defendant informed her that he had taken medication. She observed that the Defendant had difficulty following simple commands. For example, she asked him to call someone to come and pick him up four times and it was on the fifth instruction that the Defendant complied. He also "could not find his way out of the office," so Ms. Pellasma escorted him out to wait for his ride. Ms. Pellasma said that the Defendant was supposed to provide her with medical documentation as requested by Mr. Stonis but did not do so. On cross-examination, Mrs. Pellasma stated that she would not be "agreeable" to the Defendant returning to Community Corrections.

Linda Teffeteller, the Defendant's mother, testified that in December 2014, they had discovered that her husband had "stage-four lung cancer and brain cancer." Recently, her husband had been "placed on hospice." Ms. Teffeteller said that the Defendant and his father were "really close" and the diagnosis seemed to make the Defendant "angry." Ms. Teffeteller said that the Defendant had been diagnosed with "Depression. Panic attacks. Excessive anxiety." Ms. Teffeteller recalled that the Defendant's anxiety began around the time his nephew was killed, in March 2012, when hit by a train. The Defendant has been treated for his anxiety by both his primary care physician and a psychiatrist. Ms. Teffeteller identified the Defendant's prescription records that she had obtained from Walgreen's. She confirmed that the records showed that the Defendant had a prescription for Alprazolam filled on August 26, 2016.

Ms. Teffeteller said that the Defendant had had "a lot of different jobs," and received training for welding and auto body. She stated that she had no concern about the Defendant's ability to obtain employment if the trial court granted an alternative sentence. Upon questioning about drug treatment that the Defendant had received, other

than Drug Court, Ms. Teffeteller said that the Defendant had "gone to the emergency room a couple of times to try to get help." She believed, however, that he could successfully complete a drug and alcohol treatment program.

The Defendant testified that he was twenty-six years old and had completed high school. He said that he competed in football, baseball, golf, and wrestling in high school and that his grades were "pretty good." The Defendant stated that he began working when he was fourteen years old mowing lawns. Since that time he had held jobs as an auto body technician, a security officer, a "laborer," and a welder before starting his own business, "Tree Commanders and Professional Landscaping." The Defendant expressed his desire to return to school to become "a culinary arts specialist or do something with technology."

The Defendant testified that he had been diagnosed with "PTSD, two different forms of anxiety, panic disorder, and depression." He recalled that shortly after his nephew was killed, he "felt like [he] was dying." He described the episode as "weird" and the "onset" of his diagnosis. The Defendant said that he has gone to the hospital on five different occasions because of his panic attacks. He stated that, for his mental health diagnoses, he has been prescribed Citalopram, Escitalopram, Alprazolam, Klonopin, Paxil, and Strattera.

The Defendant described his father as his best friend and stated that his father's diagnosis has been difficult for him. The Defendant stated that this hearing was so important to him because he hoped to be released so that he could see his father before he died. The Defendant agreed that his criminal history was "closely related" to his drug use. Following his nephew's death, the Defendant felt "down and depressed" and used illegal drugs to self-medicate. He became addicted to the drugs, experiencing physical symptoms in their absence.

The Defendant testified that, on February 11, 2013, he pleaded guilty to identity theft and the trial court granted judicial diversion for a three-year sentence. On September 8, 2015, the Defendant was arrested on a probation violation warrant for acquiring new charges and failing a drug test. On March 24, 2016, the Defendant pleaded guilty to "a number of charges" and "submitted on a violation of [his] judicial diversion." He was ordered to complete Recovery Court as part of the agreement but did not successfully complete Recovery Court. He explained that he was removed from Recovery Court for "tak[ing] Suboxone inside the jail." The Defendant agreed to a violation based upon drug use and the allegation that he had circulated drugs in the jail and served "160-day split confinement" before being returned to Community Corrections. The Defendant agreed he was released from jail on August 11, 2016, and immediately returned to Community Corrections.

The Defendant testified that after his release from jail in August 2016, they learned that his father's cancer had spread to his spine. The Defendant said that he was "devastated" by this news and began experiencing anxiety attacks and depression. The Defendant disagreed with Mr. Stonis's testimony about the Defendant's phone call about his prescription. The Defendant said that because he was experiencing panic attacks, he called his doctor first and told them that he had four pills left from his prior prescription. His doctor said he could take the remaining pills for his anxiety "until [he] got in to see him." The Defendant then called Mr. Stonis and told him about the old prescription and his panic attacks. Mr. Stonis said, "well, just bring it in in the morning." Five or ten minutes after that conversation, the Defendant called Mr. Stonis again to make sure it was all right for him to take the prescription medication. He explained that he did this because he did not want to "mess up" and "lose time with [his] family."

The Defendant read from a medical record entry from his primary medical physician's records dated August 26, 2016 as follows:

> Emergency visit, out of jail on Community Corrections. Father placed on hospice. Took Xanax from old RX. Facing going back to jail. Panic attacks worse. Anxious. Sleep off, mood down, denies SI.

The Defendant testified about the night he was removed from the MRT class. He said that he took the old prescription after Mr. Stonis told him he could but that "[i]t affected me a lot worse than just starting out because I was on it for like three years so I was on a higher dose than what somebody starting out should be taking." He agreed that his behavior was affected by the medication on the night he attended the MRT class but that it was not intentional.

The Defendant testified that he was told to take his medication and paperwork to Mr. Stonis the following day, which he did. Mr. Stonis told the Defendant that he could not file a violation warrant based upon the violation but that he "would have to talk to the District Attorney." The Defendant stated that he did not remember having a discussion with Mr. Stonis about "turning [him]self in" on the violation warrant. The Defendant recalled that he made an agreement with Andy Long to turn himself in on a certain date. He admitted that he did not do so but explained that he failed to turn himself in so that he could spend more time with his father. The Defendant agreed that he failed to turn himself in, and then failed a drug screen when he was placed in custody. The Defendant stated that he would like to undergo inpatient treatment followed by intensive outpatient treatment. The Defendant agreed that therapy would be beneficial for him.

On cross-examination, the Defendant agreed that his initial charge was in 2011 before his nephew was killed. He was on probation through judicial diversion when he added ten additional charges in September 2015. The Defendant's judicial diversion was revoked and he was in custody from September 2015 until April 2016. During that time period, he entered the Recovery Court program, completed the "in-jail phase," and then was released to complete the second phase. The Defendant was released from jail for only a day or two before being re-sentenced to "another 160-day split." The Defendant agreed that he knew he was in violation of the Recovery Court rules at the time he took Suboxone while still in custody. The Defendant was again released on August 11, 2016, and was in "good standing" until the current violation warrant was issued on August 25, 2016. The Defendant agreed that once the warrant was issued he was "made aware" that he needed to turn himself in. The Defendant admitted that he posted on Facebook about the warrant and "turn[ing] [him]self in." After the Defendant was "picked up," he attempted to provide the jail with a false drug sample and then ultimately tested positive for opiates. The Defendant agreed that his PCP, Dr. Snow, did not prescribe opiates for him. He agreed that the current violation was the third on his identity theft conviction.

After hearing this evidence, the trial court found that the Defendant had violated the terms of his Community Corrections sentences based upon "failing a drug screen, testing positive for Benzodiazepines and also at the time of his arrest being given a drug screen that he adulterated filling the urine cup with water, then being a second screen that he failed, testing positive for Benzodiazepines, methamphetamine, amphetamine, and oxycodone." The trial court noted this was the third violation with respect to case C21131 and the second violation with respect to cases C24062, C24064, and C24065. The Defendant stipulated to the violations; however, the trial court still made the finding, in regard to discrepancies in the testimony, that Mr. Stonis's testimony was credible. About the Defendant's drug addiction and need for rehabilitation, the trial court stated:

> [Y]ou've had the opportunity to be on a diversion and you did not take advantage of that. And then even when you went on Community Corrections, you had the opportunity to get treatment in Recovery Court and you did not take full advantage of that and were terminated. And it sounds like, if I credit your testimony here today, that even after you were found to be in violation of your Community Corrections rules, you possibly had the opportunity to return to Recovery Court, and you chose not to do that. You didn't want to do that.
>
> So, sometimes we're just at the end of what's available to do.

The trial court revoked the Defendant's Community Corrections sentences and ordered the Defendant to serve the sentences in confinement.

## II. Analysis

On appeal, the Defendant argues that the trial court erred when it ordered him to serve his sentences in confinement rather than allowing him an alternative sentence. He also argues that his sentence in C21131 had expired at the time the trial court revoked the sentences.

## A. Revocation

The Defendant asserts that the trial court abused its discretion when it ordered him to serve his sentences in confinement. He argues that the trial court should have ordered split confinement, allowing him the opportunity to seek drug treatment. The State responds that the record supports the trial court's judgment. We agree with the State.

Our review of a trial court's revocation of a Community Corrections sentence is similar to our review of a trial court's probation revocation. *State v. Harkins*, 811 S.W.2d 79, 83 (Tenn. 1991). A trial court may revoke probation upon its finding by a preponderance of the evidence that a violation of the conditions of probation has occurred. T.C.A. § 40-35-311(e) (2014). "In probation revocation hearings, the credibility of witnesses is to be determined by the trial judge." *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). If a trial court revokes a defendant's probation, its options include ordering confinement, ordering the sentence into execution as originally entered, returning the defendant to probation on modified conditions as appropriate, or extending the defendant's period of probation by up to two years. T.C.A. §§ 40-35-308(a), (c), -310 (2014); *see State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999).

The judgment of the trial court in a revocation proceeding will not be disturbed on appeal unless there has been an abuse of discretion. *See State v. Smith*, 909 S.W.2d 471, 473 (Tenn. Crim. App. 1995). In order for this court to find an abuse of discretion, "there must be no substantial evidence to support the conclusion of the trial court that a violation of the conditions of probation has occurred." *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). After finding a violation, the trial court is vested with the statutory authority to "revoke the probation and suspension of sentence and cause the defendant to commence the execution of the judgment as originally entered." T.C.A. § 40-35-311(e)(1) (2014); *accord Hunter*, 1 S.W.3d at 646 (holding that the trial court retains the discretionary authority to order the defendant to serve his or her original sentence in confinement). Furthermore, when probation is revoked, the trial court may order "the original judgment so rendered to be in full force and effect from the date of the revocation of the suspension." T.C.A. § 40-35-310(a) (2014).

The evidence shows that the Defendant failed to bring the documents and items that Mr. Stonis requested to the MRT class on August 24, 2016. He attended the MRT class exhibiting signs of intoxication and was asked to leave due to his behavior. The following day, August 25, 2016, the Defendant was again told to bring the proper documentation and items for prescribed medication. The Defendant met with Mr. Stonis but, once again, failed to bring the requested information and items. Instead, he brought old pharmacy receipts showing that he had purchased prescription medication in December 2015. Mr. Stonis filed a violation warrant and notified the Defendant of the active warrant. The Defendant failed to turn himself in and when apprehended, the Defendant attempted to provide a false sample for his drug screen. Upon proper screening, the Defendant tested positive for numerous substances, including opiates. The Defendant conceded that his doctor had not prescribed opiates. Moreover, this was the Defendant's second time violating his Community Corrections sentence. Thus, the trial court did not abuse its discretion when it ordered the Defendant's Community Corrections sentence to be revoked. The Defendant is not entitled to relief as to this issue.

## B. The Expiration of Case No. C21131

The Defendant asserts that the trial court erred in imposing the Defendant's sentence in C21131 because the sentence had already expired. The State responds that because the probation violation warrant was filed before the C21131 term was set to expire, the trial court retained jurisdiction to enter an order of conviction and sentence the Defendant to Community Corrections. We agree with the State.

In *State v. Johnson*, this Court set forth the procedure for revocation of judicial diversion:

> 1. Upon placing a defendant on judicial diversion, the trial court shall enter an order reflecting the grant of judicial diversion, the length and conditions of probation, and that further proceedings are deferred. *See* Tenn. Code Ann. § 40-35-313(a)(1)(A). This shall be by order and not by the entry of the customary judgment of conviction form. A standard probation order may also be entered. Jail time may not be imposed as a condition of probation under the judicial diversion statute.

> 2. If there is an alleged violation of probation, the matter shall proceed under the ordinary procedure for revocation of probation. *See* Tenn. Code Ann. § 40-35-311(a).

3. If the trial court determines by a preponderance of the evidence that the defendant has violated probation, the trial court may find a violation of probation. *See* Tenn. Code Ann. § 40-35-311(e).

4. Upon finding a violation of probation, the trial court shall proceed to sentence the defendant for the original offense. See Tenn. Code Ann. § 40–35–313(a)(2). Sentencing shall proceed pursuant to the standard provisions of the Sentencing Act. See Tenn. Code Ann. § 40-35-101 *et seq*.

5. The trial court shall then enter a standard judgment of conviction form reflecting the sentence. Either under the special conditions portion of the judgment form or by separate order, there should also be a notation that the judgment is being entered pursuant to the judicial diversion statute based upon a violation of probation.

Generally, revocation may occur only within the probationary period. *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001). If, however, a probation revocation warrant is issued within the term of probation, it tolls the limitation of time in which the court may act to revoke probation. *Alder v. State*, 108 S.W.3d 263, 267 (Tenn. 2002) (emphasis omitted) (*citing Shaffer*, 45 S.W.3d at 555). In this case, the September 18, 2015 warrant tolled the limitation of time in which the trial court had to act to revoke probation; therefore the Petitioner is not entitled to relief on these grounds.

### III. Conclusion

Based upon the foregoing, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

- 10 -